## COURT OF APPEALS,
### March 14, 1913.

# THE PEOPLE EX REL. UNGER v. KENNEDY.

### (207 N. Y. 533.)

(1.) CONSTITUTIONAL LAW—ERECTION OF BRONX COUNTY.

The principle is well established that, while the legislature may not delegate to the People of the state the right to determine whether an enactment shall become a law, it may in certain cases permit the electors of a restricted locality to determine whether the provisions of a completed act passed by the legislature shall become operative or shall be taken advantage of; and, hence, the legislature may by statute intended to be complete and taking effect at once provide for the future erection of a new county and then permit the voters within the proposed territory, before the date of actual creation, to decide by vote whether the provisions of said statute shall be carried out and become operative. (*Barto* v. *Himrod*, 8 N. Y. 483, limited.)

(2.) SAME—VALIDITY OF PROVISIONS REFERRING TO COURTS AND THEIR SESSIONS IN TERRITORY ERECTED INTO NEW COUNTY.

The statute, chapter 548 of the Laws of 1912, entitled " An act to erect the county of Bronx," etc., which may be fairly construed as defining the boundaries of a proposed county, providing for the substantial and real organization of the county at a future date, giving to the voters of the territory defined the right before that date to indicate whether they desire to have the county created, and enacting that if the vote is adverse it shall not be operative, and its provisions for organization and creation shall not be carried out, is valid, and a contention that by the terms thereof the legislature in violation of the Constitution attempted to delegate to the people of the territory within the proposed new county the right by popular vote to determine whether said act should become or remain a law cannot be upheld.

(3.) SAME—PERSONS IN PART OF COUNTY NOT TAKEN FOR NEW COUNTY
    HELD NOT INTERESTED IN THE PROPOSITION, AND NO REFERENDUM TO
    THEM NECESSARY.

An objection that the people of the entire county were interested
in the question whether a part thereof should be detached and
erected into a new county and that, therefore, if any submission
was to be made it should have been to the voters of the entire
original county instead of solely to the people of the territory from
which the new county was to be created, cannot be upheld.  The
people in the proposed new county had a more direct interest and
responsibility in the matter than any one else and in any event the
legislature had the power and discretion, within certain limits, to
decide upon what body of people it would confer the power to
vote upon the question, and its decision in respect thereto does not
make the statute vulnerable.


(4.) SAME—INTERPRETATION OF MEANING OF PROVISIONS REGULATING
    COURTS IN NEW COUNTY.

The provisions referring to courts and their sessions in and for
the territory of the proposed county, examined, and *held*, that they
justify an interpretation of the legislative intention to the effect
that until January 1, 1914, terms of the Supreme Court held in and
for the county of New York and what may be termed the County
Courts of said county, consisting of the Court of General Sessions
and the Surrogate's Court, should continue to retain and exercise
jurisdiction over matters, actions, proceedings and prosecutions,
civil and criminal, arising in, connected with or pertaining to the
territory of the proposed new county in the same manner as they
possessed and exercised jurisdiction over such actions, matters, pro-
ceedings and prosecutions at the time the act in question was
passed.  It is a necessary implication that where courts in New
York county were given continued jurisdiction of offenses, grand
juries sitting in the same county would have corresponding
jurisdiction.


(5.) SAME—RIGHT TO PROVIDE FOR TEMPORARY ADMINISTRATION OF JUSTICE
    IN NEW COUNTY.

An objection that the act violates the Constitution in providing
for the discharge of duties by officials other than those selected by
the people of the territory in question, cannot be sustained.  While
the new county was created to the extent of being territorially de-
fined when the act was passed, it is not to become really organized

until January 1, 1914. Until that time it will be passing through a process of construction and organization and will have no county officials, judicial or otherwise. Under these circumstances the legislature had the right to provide for the temporary administration of justice in the proposed new county through the officials and courts of the county from which it was to be detached.

**(6.) SAME—BRONX COUNTY ACT NOT REQUIRED TO BE SUBMITTED TO MAYOR OF NEW YORK CITY FOR APPROVAL.**

The act was not of a character which required its submission to the mayor of the city of New York.

**(7.) JURISDICTION OVER CRIMES COMMITTED AFTER ACT TOOK EFFECT AND PRIOR TO QUALIFICATION OF NEW COURTS.**

The grand jury of the county of New York, therefore, had jurisdiction to indict and the Court of General Sessions of said county jurisdiction to try one charged with committing the crime of murder in the territory comprised within said proposed county after the time that said act took effect and before January 1, 1914. A contention that by the act in question, the grand jury and court of the county of New York were divested of jurisdiction cannot be upheld, and a writ of habeas corpus was properly dismissed.

Affirming s. c., 154 App. Div. 558.

*People ex rel. Unger* v. *Kennedy*, 154 App. Div. 558, affirmed.

(Argued February 6, 1913; decided March 14, 1913.)

APPEAL from an order of the First Appellate Division, entered January 17, 1913, which affirmed an order of Special Term dismissing a writ of habeas corpus and remanding the appellant McKenna to custody.

The fundamental question involved is whether chapter 548, Laws of 1912, entitled " An act to erect the county of Bronx," etc., violates the Constitution in delegating legislative powers because it provided for submission to the people of the territory comprised within the proposed county the question, " Shall the territory within the borough of the Bronx be erected into the county of Bronx? "

It is necessary as a basis for subsequent discussion to sum-
marize quite fully the important provisions of the act in ques-
tion.  It provided that the territory in question " is hereby
set off from the county of New York and is erected into the
county of Bronx as a separate and distinct county of the state
of New York from and after the date of taking effect of this
act; " that until judicial, congressional, senatorial and assembly
districts as then constituted by law shall be otherwise estab-
lished by law " the electors of the territory erected by this act
into the county of Bronx shall continue to vote " as therein
specified; that there shall be a County Court and a Surrogate's
Court in and for the said county, with jurisdiction and powers
as therein specified, and that there shall be elected in said
county at the general election of 1913 a county judge, surro-
gate, district attorney, sheriff, county clerk and registrar of
deeds, who shall respectively have the powers and perform the
duties and have the right to make appointments as therein
specified, and that the respective terms of office of all of them
shall begin January 1, 1914; that the terms of the County
Court and the Surrogate's Court and of the Supreme Court
should be held at a place to be fixed by the commissioners of the
sinking fund of the city of New York as provided until a court
house should be erected in said county, when said courts shall
be held there; that the Surrogate's Court and County Court
within the county of Bronx on and after January 1, 1914,
should have jurisdiction as therein provided.  Section 9 of
said act, which must be considered in considerable detail in
connection with another question hereafter, provided that the
County Court should have criminal jurisdiction after January
1, 1914; that Courts of Special Sessions and Magistrates'
Courts of the city of New York as then constituted should
continue to have jurisdiction as though the act had not been
passed, and that " the several courts within the county of New
York and within the first judicial district of the supreme court

of the state of New York shall have and retain jurisdiction of all actions, proceedings and matters that shall have been rightfully commenced in said courts prior to the said first day of January, nineteen hundred and fourteen," and that "the several courts of the county of Bronx having criminal jurisdiction on and after the first day of January, nineteen hundred and fourteen, shall have the same jurisdiction of crimes, offenses and misdemeanors that shall have been committed in the said territory that the courts of the county of New York having criminal jurisdiction now have in the county of New York, provided proceedings shall not have been already rightfully commenced in any of the courts of the county of New York for the prosecution of said crimes, offenses and misdemeanors." Provision was made for the confinement of prisoners, the raising by taxation of the amounts specified, the adoption of seals by the county judge and surrogate.

By section 5, after provision for the election of the county officers specified at the general election in the year 1913, and for the commencement of their respective terms at the following January, it was provided: " In the meantime, in order that no existing rights may be prejudiced, and to prevent an interregnum, the county officers of New York county shall continue to have their present jurisdiction, powers and duties in the territory within the county of Bronx until the first day of January, nineteen hundred fourteen, except as herein otherwise provided;" also that (section 6) "Within thirty days after the time of taking effect of this act, the justices of the appellate division in the first department shall fix the times and places for holding special and trial terms of the supreme court in the county of Bronx, as provided by the judiciary law;" also that "within thirty days after the time of taking effect of this act," the governor shall appoint a commissioner of jurors who shall hold office until January 1, 1914, and exercise the powers and possess the authority there specified.

It provided for the submission to the electors of the question already stated, and that if the majority was adverse to the erection of the county the act should " be inoperative and void," and finally that the act in question should " take effect immediately."

*Emanuel Klein, Albert H. Vitale, Otto A. Glasberg, Aaron Honig* and *Edward S. Napolis* for appellants.   The Bronx County Act, chapter 548 of the Laws of 1912, is a constitutional enactment of the legislature, with the exception of section 16 of said act.   (McGrath v. Grout, 171 N. Y. 7.)   The Bronx borough became the county of Bronx on April 19, 1912. (L. 1912, ch. 548; People v. Ahearn, 196 N. Y. 250; Matter of Sherill v. O'Brien, 188 N. Y. 185; Stanton v. Essex Co., 191 N. Y. 434; Saratoga Springs v. Saratoga Gas, etc., Co., 191 N. Y. 134; Koch v. N. Y., 152 N. Y. 75; People v. Cannon, 139 N. Y. 42; People v. Adams, 176 N. Y. 361; People v. Keeler, 99 N. Y. 479; Chenango Bank v. Brown, 26 N. Y. 471; People v. Dayton, 55 N. Y. 380; McLean v. Flagg, 46 N. Y. 401.) The Court of General Sessions was deprived of its jurisdiction to try felonies committed in the territory embraced within Bronx borough after April 19, 1912.   (L. 1912, ch. 548.)

*Charles S. Whitman, District Attorney (Robert C. Taylor* and *Stanley L. Richter* of counsel), for respondent.   The Court of General Sessions had jurisdiction to try McKenna.   (People ex rel. Farrington v. Mensching, 187 N. Y. 8.)   The act preserved the jurisdiction of the Court of General Sessions until January 1, 1914.   (People v. De Puy, 115 App. Div. 564; People v. Gay, 10 Wend. 509; People v. Leighton, 88 N. Y. 117; People v. Carolin, 115 N. Y. 658; People v. Fitzgerald, 180 N..Y. 269; Pickett v. United States, 216 U S. 456; People v. McGuire, 32 Cal. 140.)

*Louis O. Van Doren, Julius D. Tobias, Henry K. Davis, Richard H. Mitchell; George M. S. Schulz, Maurice S. Cohen, J. Homer Hildreth* and *James A. Donnelly* for Association of the Bar of the Borough of the Bronx, intervening.   Chapter 548 of the Laws of 1912 was not a bill which should have been sent to the mayor of New York city for approval.   (McGrath v. Grout, 171 N. Y. 7.)   Section 16 of chapter 548 of the Laws of 1912 is legal and constitutional.   (Stanton v. Supervisors, 191 N. Y. 428; State v. Parker, 26 Vt. 357; People ex rel. Caldwell v. Reynolds, 10 Ill. 1; People v. Nally, 49 Cal. 478.)   Jurisdiction of the Court of General Sessions of the county of New York over crimes committed in the territory of the new county was retained until January 1, 1914. (Lowenburg v. People, 27 N. Y. 356.)

*C. H. Ayres* for Bronx Home Protective League, intervening.   The act is unconstitutional because it relates to the "Property, affairs of government" of the city of New York, and was not submitted to the mayor, as required by the Constitution.   (Const. of N. Y. art. 12, § 2.)   The act is unconstitutional because of section 16 thereof providing for the submission to the voters of the borough of the Bronx the question, "Shall the territory within the borough of the Bronx be erected into the county of Bronx;" and further providing that if a majority of the votes cast on the question were against the erection of the county "then this act shall become inoperative and void."   (Barto v. Himrod, 8 N. Y. 483; Stanton v. Supervisors, 191 N. Y. 428.)

HISCOCK, J.   The imprisonment from which the appellant seeks release by writ of habeas corpus herein arose under the following circumstances:

By chapter 548 of the Laws of 1912, of which the important provisions are summarized in the prefixed statement, the

attempt was made to create the county of Bronx from the territory comprised within the limits of the borough of the Bronx in the city of New York.  Said act by its terms took effect immediately and became a law April 19, 1912.  In June of that year the appellant, as charged, committed the crime of murder in the territory comprised within said proposed county and thereafter he was indicted by a grand jury and in October, 1912, tried on said charge in the Court of General Sessions of New York county, and upon conviction was sentenced to death, and committed to confinement to await execution.  In support of his writ it is urged that by the act creating said county of Bronx the grand jury and court of the county of New York were divested of jurisdiction to consider and try his alleged crime.  In answer to this contention it is asserted, first, that the law attempting to create said county is unconstitutional and void, and, second, that even if valid, jurisdiction was thereby left with the grand jury and court of New York county until after the dates involved to consider and try such an alleged crime as appellant's.  ·

The important proposition of unconstitutionality of the act is that by the terms thereof the legislature in violation of the Constitution attempted to delegate to the people of the territory within the proposed new county the right by popular vote to determine whether said act should become or remain a law.  The provision in the act on which this proposition is based provided that at the general election in November, 1912, there should be submitted to the voters of the borough of Bronx the question, ". Shall the territory within the borough of the Bronx be erected into the county of Bronx? " and that if it should appear " that a majority of the votes cast on said question at said general election were against the erection of the county of Bronx, then this act should (shall) be inoperative and void."

While it may be possible to dispose of this particular appeal

without deciding this question of constitutionality, nevertheless it is fairly presented to us, and public interests require that it should be determined.

The most forceful way in which the proposition of unconstitutionality can be stated is that adopted by Mr. Justice INGRAHAM in the prevailing opinion at the Appellate Division. It is there reasoned by him that the Legislature in effect provided that the act creating the new county should take effect at once and then by the provision just quoted enacted that the law might be repealed by or as the result of popular vote, and he assumes, of course with entire accuracy, that no court has ever held that the legislature could delegate to popular vote the right thus to repeal a statute.

That this statute is inartificially drawn there can be no doubt, and amongst its provisions are some which by themselves perhaps tend quite strongly to support the view of provision for repeal thus taken. These are the ones in words of present tense creating the county, providing that the act should take effect immediately and that in case of an adverse vote it should become " inoperative and void," and which are supported by the less consequential if more inexplicable ones for the assignment of terms of court and the appointment of a commissioner of jurors within thirty days after the act took effect.

I am inclined to think, however, that under the principles which not only permit but require us to take into account the entire act in construing its various provisions and to so interpret them if possible as to preserve rather than destroy the work of the legislature, we may adopt such construction as will save the act from destruction on the ground now under discussion.

The act itself as of the date of its becoming a law " erected " the county in question, but the meaning and effect of this provision are really little more than to define the county

geographically as a basis for other steps. The other provisions of the statute for performance of those substantial acts, such as the election of county officials and the creation and operation of the courts whereby the proposed new county would for the first time really become organized and equipped to discharge its functions and without which there could be no actual, practical creation or erection of the county, all speak as of a date future and subsequent to the one when the referendum was to take place. While the provisions for the assignment of terms of court and appointment of a commissioner of jurors seem to be unduly anticipatory in point of time, it is to be borne in mind that it was entirely proper to make provision for them as of a date prior to the organization of the courts on January 1, 1914, and I believe that these provisions if necessary may be construed in connection with the other sections relating to courts as referring to the date when the act " took effect " as the result of the referendum rather than the date when it became a law.

The act by its terms provides that it shall take effect at once, but this means that it shall become a law at the date of its passage and does not prevent postponement of operation, as actually provided for, to a future time.

The clause of referendum contains both language which is opposed to the contention considered and also that which is somewhat unnecessarily inapt in its favor. The question to be submitted is, " Shall the territory within the borough of the Bronx be erected into the county of Bronx? " referring to the future as the time when the creation is to become effective. The clause giving effect to a vote is that in case of an adverse majority the act " shall be inoperative and void," which savors somewhat of repeal. Again, however, the real meaning and intent of these provisions are reasonably clear, and are that the voters of the territory involved shall have a right to say whether they favor the erection of a new county, and that if they

do not the act shall not be carried into operation. Grouping together these and the other provisions we have, as I think, an act which may be fairly construed as defining the boundaries of a proposed county, providing for the substantial and real organization of the county at a future date, giving to the voters of the territory defined the right before that date to indicate whether they desire to have the county created and enacting that if the vote is adverse the act shall not be operative and its provisions for organization and creation shall not be carried out.

By this interpretation we are brought to the broad and fundamental question whether the legislature may by statute intended to be complete and taking effect at once provide for the future erection of a new county and then permit the voters within the proposed territory before the date of actual creation to decide by vote whether the provisions of said statute shall be carried out and become operative.

In passing on this question in this case we are at all times to keep in mind two features of the enactment before us. In the first place the legislature passed a statute which became a law at once and which was complete in a legislative sense, however ambiguous and perhaps defective in details. It did not attempt to delegate to the voters the right and duty to determine whether the proposed enactment should become a law. While the line of distinction between delegating to voters to say whether an enactment shall become a law and delegating to them to say whether a law shall become operative might at times be a narrow one, it is one which is distinctly recognized by the cases hereinafter to be considered. In the second place the statute under consideration is not one of state-wide operation, but it only affects directly and substantially the people of a comparatively small territory, and it was to the voters of this territory most affected that the right was left to determine whether the act should become operative. I do not forget that it is urged in

this connection that the people of the entire county of New York were interested in the question whether a part of that county should be detached and erected into a new county, and that, therefore, if any submission was to be made it should have been made to the voters of the entire original county, and this suggestion may as well be disposed of here as at any point. In my opinion there are two answers to it. The people in the territory from which the new county was to be created would have a more direct interest and responsibility in the matter than any one else. On them especially would rest the privileges, responsibilities and burdens of the new county if it were created, and it strikes the mind at once that they if any one should have the right to say whether the proposed territory should be separated from the old county and turned into a new one. But further than this, if it be assumed that the legislature had the power to confer upon any body of people the right to vote on the question, it necessarily had the power and discretion within certain limits to decide upon what body of people it would confer this power and its decision in this respect does not in my opinion make the law vulnerable.

The proposition that by our Constitution general powers of legislation are conferred exclusively upon the legislature and that this body may not escape its duties and responsibilities by delegating such legislative powers to the people at large, must be regarded as so thoroughly established that it needs no discussion. But because the case of Barto v. Himrod (8 N. Y. 483) is cited not only as a leading authority for this undoubted principle but also for the proposition that the present statute comes within its condemnation, consideration must be given to that decision for the purpose of bringing before our minds the exact facts involved and, therefore, the necessary limitations upon the scope of its authority.

In that case it appeared that the legislature had adopted an enactment entitled " An act establishing free schools

throughout the state," and had provided by one of the sections, " the electors shall determine by ballot at the annual election to be held in November next whether this act shall or shall not become a law." It will be observed that this enactment if becoming operative was state-wide in its effect; also that it did not purport to be a law when it left the legislature, but that this very question of its becoming such was submitted to the electors. It was merely a legislative proposition for a statute to be passed on by the people and it was held that this was an unconstitutional attempt by the legislature to delegate its powers. Having condemned the enactment on this ground, which was all that was necessary, it is true that Judge Ruggles did assert that even if by the terms of the act it had been declared to be a law to take effect in case it should receive a majority of votes, it would nevertheless have been invalid because the result of a popular vote upon the expediency of a law was not such a future event that a statute could be made to take effect upon it, according to the meaning and intent of the Constitution.

Starting with and fully accepting the elementary proposition involved in and decided by the Barto case, we find that subsequent decisions have declared that the doctrine of that case should not be pushed beyond the question there involved and that the legislature may pass a statute which is a completed law affecting or conferring rights upon a restricted locality but to become operative only in the event of an affirmative vote by the people of such locality.

In People v. Fire Ins. Assn. of Philadelphia (92 N. Y. 311, 317), holding that the legislature might pass statutes to take effect upon the arising of a future contingency, it was specifically said that " This court has steadily declined to push the doctrine of Barto v. Himrod beyond the point which it decided."

In Bank of Rome v. Village of Rome (18 N. Y. 38) the court had before it for consideration and affirmed the con-

stitutionality of an act which authorized the president and trustees of the village of Rome to subscribe for and take stock in a railroad corporation, but provided that they should have no power to make such subscription until it had been previously approved by two-thirds of all the electors of a certain class. In thus deciding the court said: " The case is, therefore, in substance, only a submission to a vote of the parties interested, of the question whether or not they chose that the municipal corporation should subscribe to the railroad.  In other words, the legislature did not compel the village to subscribe but, creating by law the necessary machinery, left it to the taxpayers to determine that matter."  (p. 45.)

In Starin v. Town of Genoa (23 N. Y. 439, 447) the act considered was one authorizing the town officers to borrow money and invest it in the stock of a proposed railroad corporation, with the provision that the officers appointed to do this should have no power to do it unless the written consent of two-thirds of the taxpayers had been obtained. In upholding the constitutionality of the act the court said: " The act   *   *   *   by its terms took effect immediately ; but parties to be affected by it were at liberty to accept the privileges granted, and incur the burdens and obligations it would impose as their interest or will should dictate: and any one or more of the towns, referred to therein, could take the benefit of it, and make it effective as to themselves.   *   *   * It was   *   *   *   in all its material characteristics entirely different from the school law " (involved in the Barto case).

In Clarke v. City of Rochester (28 N. Y. 605) the statute authorized the city of Rochester to subscribe for and become the purchaser of stock in a railroad corporation which was to terminate in the city, but contained the provision that the provisions of the act should not take effect until they should have been submitted to the electors at a special election, and, distinguishing such a statute from the enactment involved in

the Barto case, it was held that the legislature might thus confer upon the representatives of the municipality the power to make subscription upon condition that the act should be submitted to and meet the approbation of the electors.

In Bank of Chenango v. Brown (26 N. Y. 467) the court makes it plain that the doctrine of the Barto case is not to be extended and distinctly differentiates between the question there discussed and the one, very nearly akin to the present one, which arises where the legislature creates a municipal charter for a certain territory and then permits the people of that territory to determine whether the act shall take effect, and which latter provision it holds to be constitutional. Judge EMOTT, writing for the court, after referring to acts of the latter character, says (p. 475): "I perceive no difference whether the statute submits an entirely new charter, or amendments to an existing one, to the constituency to be affected. Either way the legislative action is complete and final, and the vote of the municipality is simply a determination of the expediency of their accepting the result of that action."

In Stanton v. Board of Supervisors (191 N. Y. 428), which contains the last declaration of this court on this general subject, a statute was reached for consideration quite similar in its underlying principles to the present one. It was the provision of the County Law (Laws of 1892, chapter 686) relating to the change of site of a county seat, and providing that after such change had been approved by the board of supervisors the question of the proposed removal should be submitted to the electors of the county at the ensuing general election in the manner provided, and that if the majority vote should be in favor of such removal the proceedings of such board of supervisors should be deemed ratified by the electors and the change made accordingly. In upholding this law the court, through Judge HAIGHT writing the opinion, recognized

the difference between enactments pertaining to the whole state and those pertaining to localities, and the manifest propriety in making a change of the county seat dependent upon the vote of the electors of the county, who of all persons could best determine the place that would be most accessible and convenient for the transaction of the business of such county, and that such a delegation of power was sanctioned by the authorities reviewed in the opinion then being written, and which largely have been reviewed in the present discussion.

In addition to these and other more or less similar authorities the law is so familiar as to render any review unnecessary that the legislature may delegate to municipalities and restricted localities the right to determine whether they will act under or take advantage of statutes pertaining to such subjects as municipal government and excise.

As the result of these controlling authorities in this state, we have the principle well established that while the legislature may not delegate to the people of the state the right to determine whether an enactment shall become a law, it may in cases like those specified permit the electors of a restricted locality to determine whether the provisions of a completed act passed by the legislature shall become operative or shall be taken advantage of. That is the underlying principle, and the question is whether it should be applied or extended to such a case as the present one. There certainly is no difference in the principle involved in permitting the electors of a city to determine by vote whether they will take advantage of an act allowing the municipality to invest in a railroad, or to the electors of a county whether they will make a given change in the county seat, or to the voters of a specified territory whether they desire that an act incorporating that territory as a municipality shall become operative, and the one before us permitting the electors of a restricted district to determine whether the provisions of an act erecting that territory

into a new county shall be carried out and become operative. The principle governing each case is that the legislature having discharged its duty by framing and enacting a completed legislative plan and statute affecting the people of a limited locality may then leave it to them to say whether they do or do not desire to take advantage of the law thus passed. The only question is whether we shall apply an old principle to a somewhat different situation, although, as suggested, it is difficult for me to draw any real distinction between permitting under an act already passed the inhabitants of a given territory to say whether they desire that such territory shall be incorporated within a city and permitting the inhabitants of a similar territory to say whether they desire that such territory shall be erected into a separate county. I see no danger in making the extension if it be one. It is commended by every argument which tended to support the decisions which have been referred to, and it seems manifestly just and fair that after the legislature has provided for the creation of the new county the people who will especially be affected by such step should have a right to express their approval or disapproval in the manner prescribed.

Passing from decisions of courts of our own state, the view thus indicated is supported by authorities which while not controlling are still entitled to much consideration.

It has been frequently determined that an act creating or amending a municipal charter or granting municipal powers is not rendered unconstitutional because of a provision that the voters of the territory or municipality involved shall have a right to decide whether the act shall become effective. (Dillon on Municipal Corporations [5th ed.], sec. 69; City of Paterson v. Society, etc., 24 N. J. L. 385; State ex rel. Warner v. Hoagland, 51 N. J. L. 62; State ex rel. Dome v. Wilcox, 45 Mo. 458; Orrick v. City of Fort Worth, 114 S. W. Rep. 677.)

In Commonwealth v. Judges of Quarter Sessions (8 Penn. St. 391) it was held that an act granting to the electors of a town the right to determine whether a newly erected township should be continued was not an unconstitutional delegation of power.

Smith v. McCarthy (56 Penn. St. 359) seems to me to sustain precisely the principle invoked in the claim of constitutionality of the present act. It was there held that an act prescribing certain boundaries for the city of Pittsburg, which should include three sections of territory, and providing that the citizens within each section should vote on the question of consolidation, and that only those sections whereof the vote was favorable should be brought into the corporation was not unconstitutional. It was said, " It is not unconstitutional to submit such a question to the people. We do not regard it within the principle which forbids delegation of legislative power. That is applicable to the creation of laws, which the law making power provided by the constitution must not delegate."

Judge Cooley, in his " Constitutional Limitations " (7th ed. p. 163, etc.), after recognizing fully the general principle that the power conferred upon a legislature to make laws cannot be delegated, nevertheless asserts the constitutional power of a legislature to permit the people of a restricted territory in such a case as the present one to decide whether a completed act affecting them shall become operative. He says (p. 167) " the question whether a county or township shall be divided and a new one formed, or two townships or school districts formerly one be re-united, * * * is always a question which may with propriety be referred to the voters of the municipality for decision."

And the following cases, some of them on facts presenting almost the precise question here involved and all of them in opinions broad enough to cover it, uphold the principle thus.

stated, some of them going farther than is necessary for that purpose. (Alcorn v. Hamer, 38 Miss. [1860] 652, 750, 753, etc.; People ex rel. Love v. Nally, 49 Cal. 478; People ex rel. Graves v. McFadden, 81 Cal. 489; People ex rel. Caldwell v. Reynolds, 10 Ill. [5 Gilm.] 1; People ex rel. Wilson v. Salomon, 51 Ill. 37; Mayor v. Finney, 54 Ga. 317; State ex rel. Atty.-General v. O'Neil, 24 Wis. 149; Bull v. Read, 13 Gratt. [Va. 1855] 78; State v. Parker, 26 Vt. 357; Cincinnati, W. & Z. R. R. Co. v. Comrs, etc., 1 Ohio St. 77, 87; State ex rel. Dome v. Wilcox, 45 Mo. 458.)

Reaching the conclusion that the act is constitutional, I next proceed to an attempt to determine the meaning of its provisions with reference to courts and their sessions in and for the territory of the proposed county. Some of these provisions are so framed as to make their interpretation difficult. Starting with the assumption, however, as we are bound to, that the legislature did not intend to create a condition of confusion in judicial proceedings in the territory in question, and taking into account the general purpose of the act and all of its provisions bearing on this subject, a permissible interpretation may be reached which will safeguard the interests of the public.

Some of the provisions bearing on the subject are entirely plain. The status and jurisdiction of certain City Courts in the city of New York are preserved without disturbance or change. The two courts of county-wide jurisdiction in the proposed new county, the County Court and the Surrogate's Court, do not come into existence until January 1, 1914. The terms of various officials who will be essential to the administration of any courts in the new county, the district attorney and the sheriff, as well as the county judge and the surrogate, will not begin until January 1, 1914, and no permanent quarters for the holding of courts can be established in said proposed county until after said date.

With these provisions in mind we pass to the consideration of section 9, which especially deals with this subject. Its opening sentence is that " from and after the time of the taking. effect of this act, the supreme court and on and after the first day of January, nineteen hundred fourteen, the county courts shall have jurisdiction over all crimes and misdemeanors committed within the territory of the county of Bronx, except as herein otherwise provided." Of course the County Court would not have jurisdiction until the date named, and the Supreme Court would have jurisdiction without any express provision, the only question being whether this jurisdiction prior to January 1, 1914, should be exercised by terms of said court held in the proposed county or held in and for the county of New York as constituted at the time the act was passed.

By the limitation at the end of the sentence we are expressly authorized to look at the remainder of the section for the purpose of settling this as well as other questions. For purposes of plainness transposing, but not at all altering the language of, these remaining sentences, we have the section providing " That the several courts within the county of New York and within the first judicial district of the supreme court of the state of New York shall have and retain the jurisdiction of all actions, proceedings and matters that shall have been rightfully commenced in said courts prior to the said first day of January, nineteen hundred fourteen, (and) until the first day of January, nineteen hundred fourteen the said courts of the county of New York and in the said first judicial district shall retain and exercise in all civil and criminal proceeding the same jurisdiction they now have, and the several courts of the county of Bronx having criminal jurisdiction on and after the first day of January, nineteen hundred fourteen, shall have the same jurisdiction of crimes, offenses and misdemeanors that shall have been committed in

the said territory that the courts of the county of New York having criminal jurisdiction now have in the county of New York, provided proceedings shall not have been already rightfully commenced in any of the courts of the county of New York for the prosecution of said crimes, offenses and misdemeanors, in which case, the said courts within the county of New York shall have and retain jurisdiction of the same with full, complete and final disposition thereof."

In the first place, these provisions will bear the interpretation of a legislative intent to place terms of the Supreme Court held in and for the county of New York on the same basis as County Courts in respect of the retention of jurisdiction over the territory of the new county until January 1, 1914. The language " the several courts within the county of New York and within the first judicial district of the supreme court" shall have and retain jurisdiction, etc., and that " the said courts of the county of New York and in the said first judicial district shall retain and exercise jurisdiction, etc.," is of itself broad enough to sustain this interpretation and which is not only in harmony with the general situation created by and existing under said act but as I apprehend may be necessary to the avoidance of great confusion. If the act does not mean that terms of the Supreme Court held in and for the county of New York were thus to retain jurisdiction it must mean that from the time when the act took effect, whether the date of its passage or of its acceptance by popular vote, the Supreme Court should exercise jurisdiction in the proposed new county through terms of court held in and for said county and that the terms of court held in and for the county of New York would be without jurisdiction. As we are informed by the brief without dispute no terms of the Supreme Court have been assigned or provided for the new county. On the other hand, we can scarcely avoid assuming that between the time when said act took effect and the pres-

ent time not only civil but criminal matters originating in the
territory of the new county since the act took effect have been
disposed of at terms of the Supreme Court held in and for the
county of New York, and an interpretation that the Supreme ·
Court at such terms was without jurisdiction would, to say the
the least, be unfortunate.

In the second place, passing the question just discussed, I
think that the provisions which have been quoted justify the
interpretation of the legislative intention that until January 1,
1914, terms of the Supreme Court held in and for the county
of New York and what may be termed the County Courts of
said county, consisting as far as I am aware of the Court of
General Sessions and the Surrogate's Court, should continue
to retain and exercise jurisdiction over matters, actions, pro-
ceedings and prosecutions, civil and criminal, arising in, con-
nected with or pertaining to the territory of the proposed new
county in the same manner as they possessed and exercised
jurisdiction over such actions, matters, proceedings and prose-
cutions at the time the act in question was passed.   The pro-
vision that these courts should have and " retain " jurisdiction
of all such matters as should have been " rightfully com-
menced " in said courts prior to the said 1st day of January,
1914, and that said courts should " retain and exercise in all
civil and criminal proceedings the same jurisdiction they now
have," does not sensibly permit of any other interpretation.
The power to said courts to " retain " jurisdiction after
January 1, 1914, necessarily implies the right until that date·
to take jurisdiction of matters arising in or pertaining to the
territory of the new county, which would naturally be tried or
heard by courts sitting in and for said county, for if this jur-
isdiction was simply exercised on the basis of the county of
New York as left after the new county was created, no provi-
sion for retention would be necessary.   And the provision that
the courts of the new county on and after January 1, 1914,

should have jurisdiction of offenses committed in said territory, provided proceedings should not have been rightfully commenced in any of the courts of New York county for the prosecution for offenses committed in the territory of said new prsecution for offenses committed in the territory of said new county might be commenced in the courts of New York county. The word " rightfully " in the connection in which it is used probably serves no more useful purpose than the superfluous one of indicating that the jurisdiction to be exercised by the courts respectively was of and over those matters of which they had jurisdiction aside from any considerations presented by the erection of the new county.

It does not seem to me that any trouble arises as suggested through failure of specific provision with reference to grand juries but that it is a necessary implication that where courts in New York county were given continued jurisdiction of offenses, grand juries sitting in the same county would have corresponding jurisdiction. (Code of Crim. Proc. sections 223, 252.)

In view of these provisions and the other one that intermediate the election and induction into office of officials of the new county, the county officers of New York county shall continue to have their former jurisdiction, powers and duties in the territory of the new county, it is urged that this act violates the Constitution in providing for the discharge of duties by officials other than those selected by the people of the territory in question. This objection again does not seem to me to be so serious as some of the others which have been discussed. While the new county was created to the extent of being territorially defined when the act was passed, it is not to become really organized until January 1, 1914. Until that time it will be passing through a process of construction and organization and will have no county officials, judicial or otherwise. Under these circumstances without considering whether it

might otherwise be the law, I feel sure that the legislature had the right to provide for the temporary administration of justice in the proposed new county through the officials and courts of the county from which it was to be detached. It is difficult to perceive just how a new county could be created and organized without some such provisional and temporary plan. (Meehan v. Zeh, 77 Minn. 63; Clark v. Goss, 12 Texas, 395; O'Shea v. Twohig, 9 Texas, 336; Milk v. Kent, 60 Ind. 226.)

We are all agreed that the act was not of a character which required its submission to the mayor of the city of New York. (McGrath v. Grout, 171 N. Y. 7.)

In accordance with the views expressed I am led to the final conclusion that the grand jury of the county of New York had jurisdiction to indict, and the Court of General Sessions of said county jurisdiction to try, relator as was done and that his writ was properly dismissed and that the order appealed from should be affirmed.

CULLEN, Ch. J. I vote to affirm the order appealed from. The relator was convicted of murder in the first degree in the Court of General Sessions in October, 1912, and is in the state's prison awaiting execution under that sentence. He seeks to be released on the ground that, by reason of chapter 548 of the Laws of 1912, entitled " An act to erect the county, of Bronx," passed April 19th, 1912, the General Sessions of the county of New York had no jurisdiction to try and punish him for his offense, which was committed in the territory set off from the county of New York and formed into the county of Bronx. In the determination of this appeal it is not necessary to pass upon the constitutionality of that statute. If the statute is unconstituional and void, the Court of General Sessions of the county of New York clearly had jurisdiction of his offense, because in law there was no new county of the Bronx, while if the statute is constitutional, equally that court

had jurisdiction, for it is expressly provided that until the 1st of January, 1914, the courts of the county of New York and in the first judicial district shall retain and exercise in civil and criminal proceedings the same jurisdiction which they previously had.    The statute cannot be severed and some of its provisions held constitutional and some unconstitutional. · They are but interdependent parts of a single harmonious scheme.    Under the statute no judicial officers are to be elected in the new county until the date named, and the rejection of the provision continuing the jurisdiction of the courts of the county of New York till that time would leave an interval of nearly two years, during which the county would be without the local courts provided for by the Constitution.    The statute must, therefore, be accepted or rejected in its entirety. Neither view can benefit the relator.

GRAY, J.    While concurring in the affirmance of the order, I dissent from so much of the opinion of Judge HISCOCK, as holds the act of 1912, (Chap. 548), to be constitutional legislation.    I think the effect of section 16 of that act was to delegate to the people of a portion of the territory affected a power, exclusively, legislative; namely, the power to declare whether the act of the legislature should be operative as a law.    That section provides that, at the general election appointed to be held, the question was to be submitted to the voters: " Shall the territory within the Borough of the Bronx be erected into the County of the Bronx?    If it shall appear that a majority of the votes cast on said question at said general election were against the erection of the County of Bronx, then this act shall be inoperative and void."    To state the proposition, in its broadest and mildest form, this was a division by the legislature with the people of the territory of a responsibility, with which the former was, exclusively, invested. Under the Constitution of the state, (Art. 3, sec. 1), the legis-

lative power is vested in the senate and the assembly.  When exercising that power by the enactment in question, the legislature, in precise terms, in the first section, partitioned off from the county of New York the territory known as the borough of the Bronx and " erected (it) into the County of the Bronx as a separate and distinct county of the State of New York *from and after the date of taking effect of this Act.*" By the last section, the act was to take effect *immediately.* Thus, a county was, at once, created upon the passage of the act and, in its creation, the legislative body exercised one of the most important functions within its province.  It was erecting a new political subdivision of the state and, when so acting, its action was intended to be, and is made, exclusive. No right was reserved by the People, when committing these high powers to its legislative body, to avoid, or repeal, an act by a popular vote.  In submitting the question, whether the territory described should be erected into a county, after that the county had been, actually, created by the bill becoming a law, the legislature delegated the power to the voters of that territory to declare the statute inoperative and void; that is to say, abdicating a duty, exclusively, its own, to repeal a bad, or undesirable, law, it delegated that duty to others.  The People might alter the fundamental law and provide for such a referendum; but, until that step be taken it is, impliedly, forbidden by the People.  The decision of the leading case of Barto v. Himrod, (8 N. Y. 483), is applicable and its doctrine is quite as salutary to-day.  There, the electors were to vote upon the proposition whether the act " establishing free schools throughout the State " should become a law and, as the vote resulted, adversely, or favorably, the act was to be " null and void," or should " become a law."  In holding that the legislature had no power to make such submission, it was reasoned that the People did not reserve to themselves the power of ratifying, or adopting, laws proposed by the legislature, except

as it might be expressed, and that it was an unsound policy that the legislator should shift the responsibility, with which he is charged by his constituents, upon others. It was held that, on the question of expediency, " the *Legislature must exercise its own judgment definitively and finally.*" It was said " the event on which the Act was made to take effect was nothing else than the vote of the People on the identical question which the constitution makes it the duty of the Legislature itself to decide. The Legislature has no power to make a statute dependent on such a contingency, because it would be confiding to others that legislative discretion which they are bound to exercise themselves, and which they cannot delegate or commit to any other man or men to be exercised." (p. 491.) That case is still authoritative on the fundamental question of the right of the legislature to submit to the electors the question whether an act should become a law, or whether it should be null and void. In the cases, which have been referred to as affecting the authority of Barto v. Himrod, the question did not involve the same proposition, nor go so far as to hold that, after the legislature has enacted a bill into a law, it may be repealed by a popular vote.

In addition to the views I have expressed, and which need no more extended discussion to carry whatever force they may possess, I think the act is vicious, further, in the respect discussed, that, upon the assumption that the legislature might possess the power exercised in the enactment of section 16 of this act, the submission provided for should have been to the electors of the county of New York. The territory is taken from that county and all of the people within its borders are affected. But, if all the people were affected by the passage of the act, why may only a portion decide whether it shall continue to be a law? Upon what principle, of law, or of politics, can we uphold such discriminative legislation?

It seems to me that every consideration of wisdom and of

sound policy demands that such loose legislation, as this act embodies, should be unsparingly condemned.

CUDDEBACK, HOGAN and MILLER, JJ., concur with HISCOCK, J.; WILLARD BARTLETT J., concurs with CULLEN, Ch. J.; GRAY, J., also reads opinion.

Order affirmed.